STATE OF IOWA, appellee, v. JAN KOBYLASZ, appellant.

No. 47678.

(Reported in 47 N.W.2d 167)

1162

APRIL 4, 1951.

REHEARING DENIED OCTOBER 19, 1951.

Joseph Z. Marks and Verne Lawyer, both of Des Moines, for appellant.

Robert L. Larson, Attorney General, Don Hise, Assistant Attorney General, and Robert O. Frederick, County Attorney, for appellee.

SMITH, J.—Defendant, in 1949, operated a taxi service in Winterset, Iowa. The prosecuting witness, Mary Wells, was an employee of the Ben Franklin Store and had been employed at various places during the six years she had resided in Winterset. She had used defendant's taxi service at various times including one trip to Missouri, about one hundred twenty miles. She admits "I * * * sometimes requested that Jan drive the cab, but I didn't make that request every time."

She testifies that on the night in question (October 3, 1949, "at approximately 10 in the evening") she called defendant to take her to the Dean Moore residence (five blocks away) in the east part of town. She says when they arrived there defendant refused to stop but drove on out to the Miller Burns farm northeast of town. She relates a bizarre story to the effect that he took her into the house where he and Burns drank whisky while she "sat there in a chair [a mere spectator] until approximately 12 o'clock midnight." She says she then "went out to the taxicab and laid down in the back seat alone" for about an hour. Burns once came out to inquire if she was "mad." She says she denied being angry but told him she wanted to go home.

According to her testimony defendant later came out angry "because I had gone out to the taxi, but he got in the cab." He started to drive her home. She says he stopped at a "corner south of the golf course" and upon her refusal "to go out with" him demanded payment of an alleged $500 taxi account which he would settle for $200. When she denied owing him he called her a liar and struck her twice with the back of his hand.

There follows her further testimony: that he told her to write a check for $200, which she refused to do because she did not "have any money in the bank"; that they (at her request) returned to the Burns farm from which they had been gone about three quarters of an hour; that Burns came out and got in the car; that she and defendant briefed him on the situation; that after talking for over an hour Miller went into the house to get his hat and shoes (defendant says: "He didn't have no shoes or pants on, just a blue denim shirt") preparatory to going with them into town at defendant's request; that "Jan [defendant] started the car and I grabbed the switch keys and threw them into the bottom of the car."

The testimony becomes increasingly difficult to condense and translate into coherent form. The keys were retrieved after the witness had again thrown them (this time outside the car). Defendant twisted her arm while she screamed for Miller to come out. Miller got into the car. Defendant wanted to know where they were going and Miller said they were going to town and he "wasn't going to see me hurt." Defendant threatened "I am going

to get her job and I am going to break every bone in her body if she don't sign that check" and ordered Miller out of the car.

After Miller got out they went some distance. Defendant stopped the car and eventually compelled the witness to sign the $200 check, using his pencil. They had gone back past the Burns farm before this was accomplished and the witness had been prevented from leaving the car by threats and a gun in her back.

For some unexplained reason the witness by this time was on the front seat with defendant. Her pocketbook was on the seat between them. He picked it up and she inquired what he was going to do with it. He took her billfold out and after going through it "stuck it in his pocket." She says the billfold contained $27 and that he refused to give back her social security card or even "at least enough money to pay my room rent, because I don't have any other money."

According to her testimony they returned to town about 6:30 a.m. and she did not see defendant again until the following day when he came into the store where she worked and wanted her to return his pencil, presumably the one with which she had signed the check. After some argument he went out but returned in fifteen or twenty minutes. He refused to return her billfold and stated he intended to keep it. When the witness threatened to call the store manager defendant said, "I am going to take this [the billfold] to the sheriff. I have got your billfold here and plenty enough evidence in it. I can throw you in jail." The witness filed complaint that night in Justice Court.

The resulting indictment charges defendant with the crime of robbery in that he "did rob Mary Wells of a billfold containing $27 in money, together with other articles of value, the said Jan Kobylasz being then and there armed with a dangerous weapon with intent, if resisted, to kill or maim the said Mary Wells, and * * * did commit said robbery with force and violence, and did strike the said Mary Wells at the time of said robbery, contrary to the laws and statutes * * *, to wit, section 711.1 of the 1946 Code of Iowa."

That the testimony of defendant and Miller Burns presents a quite different picture of what took place that night is not surprising. Even the cross-examination of prosecutrix elicited that she and defendant had been out to the Burns place at least twice

before when they were alone and "a time or two there was someone else there but I don't recall their names." Burns testifies: "She came there with Jan Kobylasz, and had been there on other occasions, but I can't state how many." He says all three had been drinking whisky. Defendant says they had been out there "probably a dozen times or more, meaning Mary and myself." He testifies they went the night in question by prearrangement. "That was the agreement, to go out there and have a little fun." It was for the jury to determine between the conflicting accounts.

Both men testify they ran out of liquor during the night and drove into town and got more. Burns says defendant and Mary were at one time in the bedroom alone for a short time "and Mary Wells never made any complaint to me that Mr. Kobylasz was mistreating her."

Defendant and wife operated a "beer tavern and a taxi line." The wife testifies, "the last two beer permits were in my name." She says defendant was "addicted to the use of alcoholic beverages", at times to excess. She also says prosecutrix from time to time placed a call for taxi service and would specify defendant was to drive her. On one occasion, when Mrs. Kobylasz told her they had a driver working on a percentage and wanted "to give him all the work we can", she says Miss Wells "didn't act real friendly" and after that would hang up if defendant was not there.

Three character witnesses reported Miss Wells' reputation for moral character as bad. One of them gave like testimony as to her reputation for truth and veracity.

The trial court instructed on robbery with aggravation, robbery, larceny from the person, larceny, assault with intent to rob, assault with intent to inflict great bodily harm, assault and battery, and simple assault, and submitted verdict forms accordingly. The verdict was for larceny from the person; the sentence, fifteen years in the state penitentiary. Defendant appeals.

I. Defendant contends first that the trial court erred in submitting larceny from the person as an included offense. The contention seems to be conclusively answered by the Iowa decisions. See State v. Taylor, 140 Iowa 470, 473, 118 N.W. 747, where earlier cases are cited in support of the proposition that larceny and larceny from the person are included in the offense

of robbery; State v. Schell, 172 Iowa 127, 129, 153 N.W. 62. In the last cited case (at page 130) it is held the fact the larger and the lesser offenses are not covered by the same statute is immaterial. See also the language in State v. Davis, 236 Iowa 740, 744, 19 N.W.2d 655.

II. Defendant cites the case of State v. Graff, 66 Iowa 482, 483, 24 N.W. 6, to the proposition that larceny from the person is committed by "*stealth*", and robbery by "*force or violence or by putting in fear.*" He complains that the instruction given on larceny did not include the element of "stealth." The apparent argument is that in order to constitute larceny from the person the taking must be clandestine—without the knowledge of the owner.

▮ Our statutory definitions of larceny and larceny from the person do not include secrecy or ignorance of the owner as a necessary element. See sections 709.1 and 709.6, Iowa Code 1950, I. C. A. Despite the quoted dictum in the Graff case, supra, we find no case that holds secrecy necessary. In 52 C. J. S., Larceny, section 7b, it is said:

"In the absence of statutory provision to the contrary secrecy is not itself an element of larceny, but is only an evidentiary fact from which a felonious intent may be inferred; and the offense may be committed, although the property is taken with the owner's knowledge, if he does not consent to the taking." And see also idem, section 8a, as to Larceny from the Person.

In State v. Fisher, 106 Iowa 658, 77 N.W. 456, a conviction of larceny from the person seems to have been sustained without discussion of "stealth" where the property was snatched from the prosecuting witness's hand. In fact, anciently, "stealth" meant merely "the wrongful taking of goods without pretense of title." See Black's Law Dictionary, Third Ed., page 1658.

Early in the history of our court it was said: "The word 'steal' has a uniform signification, and in common as well as in legal parlance, means the felonious taking and carrying away of the personal goods of another." State v. Chambers, 2 Greene (Iowa) 308, 311.

▮ III. Defendant's complaint of the instruction (submitting larceny from the person) and the verdict based thereon seems

also to be that there was no evidence the property was actually taken from Miss Wells' *person*. In State v. Calhoun, 72 Iowa 432, 435, 436, 34 N.W. 194, 196, 2 Am. St. Rep. 252, it was held that though the robbery statute contemplates the taking of property "from the person" of another, the language does not mean the property must be "upon or in some way attached to the person of the individual robbed, or in his immediate presence." The opinion says: "If it be away from the owner, yet under his control, in another room of the house * * * it is nevertheless in his personal possession; and, if he is deprived thereof, it may well be said it is taken from his person."

This decision, with others of like character, is cited in the annotation 123 A. L. R. 1100. It is somewhat in point here by reason of the analogy between the crimes of robbery and larceny from the person. In 52 C. J. S., Larceny, section 11, it is said: "to constitute larceny from the person the thing stolen must be taken from the actual person of the owner, *or at least from his possession and immediate presence * * *.*" (Italics supplied.) The text is supported by citation of Banks v. State, 74 Ga. App. 449, 40 S.E.2d 103. The corresponding text in 36 C. J. 754, 755, section 66, does not contain the italicized part of the language above-quoted from C. J. S.

The Georgia case (Banks v. State, supra) is the only recent decision which expressly broadens the definition in the respect we are considering. There is an old Minnesota case, State v. Eno, 8 Minn. 220, 223, which says larceny from the person "extends to every case of stealing where the property stolen is on the person or in the immediate charge and custody of the person." That seems a reasonable construction. See also State v. Reyner, 50 Or. 224, 91 P. 301, 302.

The somewhat recent case of Wilder v. State, 30 Ala. App. 107, 1 So.2d 317, and the more ancient (1897) one of People v. McElroy, 116 Cal. 583, 48 P. 718, construe the language as applying only if the property is taken *off* the person of the complaining witness, which after all is slightly different from the words "from the person" which do not necessarily connote that the property, when taken, must be actually *on the person*.

We are not disposed to construe the statute thus narrowly. Here the property was in the possession and immediate presence

—in the immediate charge and custody—of the prosecutrix. We think the taking, under the testimony, was away from, though not actually *off*, her person. She was at the moment carrying it on the automobile seat beside her. The jury could find it was stolen from her person.

IV. Defendant assigns as error the refusal of the trial court to instruct (as requested) that the jury might consider, as bearing on the question of defendant's criminal intent, certain testimony indicating that he took the billfold and contents as security for, or in payment of, a debt owed him by Miss Wells.

He did not testify to any such purpose. The only evidence along that line is the testimony of a witness for the State, who says that on October 4 or 5 defendant "told me he had her billfold and he was holding it for security on this [taxi] bill."

Defendant cites State v. Hollyway, 41 Iowa 200, 20 Am. Rep. 586, a robbery case in which it was held error to exclude testimony offered by defendant tending to show his acts complained of were performed in an effort to collect a good faith indebtedness owed him by the prosecuting witness. Such evidence was held admissible to disprove felonious intent. Defendant also cites 32 Am. Jur., Larceny, section 41, page 938.

The trouble with his contention here is that he offered no such testimony concerning his intent in taking the property. On the contrary he testifies, "I don't know if Mary Wells was in love with me or not, but she was calling me every day. * * * *I have never charged her anything for a taxi bill.*"

We think the record here did not require the giving of the requested instruction.

V. Defendant complains of the refusal to give a requested instruction on impeaching testimony, and criticizes the instruction given on that subject. We have examined both the one given and the one refused and find no error at this point.

The jury was told, in substance, that such testimony was competent and should be given "such weight as you deem it entitled to in weighing the testimony of the impeached witness." This was followed by properly balanced instruction under which the testimony of such impeached witness might be either disregarded or given "such weight and credit as you deem it entitled to under the facts and circumstances shown."

We find nothing either "misleading" or "confusing" in the given instruction.

VI. Other complaints concerning instructions given and refused have been examined by us. We think those given were adequate and we find no reversible error in the matters complained of.

One requested instruction embodied the thought ("falsus in uno, falsus in omnibus") that if the jury should find any witness had "wilfully sworn falsely in regard to any matter or thing material to the issues" they would be "justified in disregarding the whole testimony of such witness, except insofar" as they found it "corroborated by other credible evidence in the case, or by facts and circumstances proved upon this trial."

The giving of such an instruction was approved in O'Hara v. Miller, 64 Iowa 462, 20 N.W. 760. Had it been given here we probably would not have held it error. But the giving of such instruction is much in the discretion of the trial court. 64 C. J., Trial, section 551; 53 Am. Jur., Trial, section 784; Wunrath v. Peoples Furniture & Carpet Co., 100 Neb. 539, 160 N.W. 971, 973. See also 23 C. J. S., Criminal Law, section 1259; annotation 90 A. L. R. 74 et seq.

The testimony of the prosecuting witness here was in some respects quite incredible. But the portions which were in conflict with the other testimony, particularly that of defendant and Burns, relate to somewhat collateral matters—the nature and occasion of the trip, the relation between the prosecutrix and defendant and the conduct of prosecutrix in the respect of joining or not joining her companions in the consumption of whisky.

We cannot hold that failure here to give the instruction constituted reversible error. The corroboration of prosecutrix' testimony as to the actual taking of the property by defendant is in fact found in the uncontradicted testimony of other witnesses of admissions or statements by defendant a day or two later. We cannot doubt the jury, in rejecting the theory of "force and violence", properly appraised the situation.

Defendant does not deny the taking or the subsequent admissions. He merely disclaims memory of them. Nor does he in his testimony deny still having the billfold in his possession.

1170

■ VII. Defendant's testimony and that of an expert witness produced by him foreshadowed a claim that defendant, due to alcoholism and the effect of his excessive drinking on the night in question, suffered a "blackout" or a "blanking out mentally." Complaint is now made of some reference to this by the county attorney, in closing argument to the jury, as a "new fad in defenses" which any of them might know if they "read the papers."

The arguments were not reported and the actual words used and the argument for the defense to which it was a reply are not shown. No objection was made until the close of the arguments. Incorporated in the abstract are copies of two newspapers which headlined a sensational murder trial then going on in another county in which the defendant there was claiming a "blackout." We are left to deduce these are the papers counsel referred to as exemplifying "a new fad in defense."

There is no reason to infer prejudice here, even if it be conceded the argument was improper. Nor can we pass on its propriety without knowing to what argument it was a reply. Hein v. Waterloo, C. F. & N. R. Co., 180 Iowa 1225, 1231, 1232, 162 N.W. 772. We conclude there is no showing of error.

The whole record reveals a peculiar situation but the evidence is in conflict and it was for the jury to determine what transpired and the nature and extent of defendant's guilt if he was found guilty. The jury would not have to believe (evidently did not believe) all the testimony of the prosecuting witness in order to return the verdict complained of. Defendant had a fair trial and there was no reversible error. That is the only matter we are called on or permitted to consider.

The judgment is affirmed.—Affirmed.

WENNERSTRUM, C. J., and BLISS, GARFIELD and THOMPSON, JJ., concur.

MULRONEY, OLIVER and HAYS, JJ., dissent.

MANTZ, J., not sitting.

MULRONEY, J. (dissenting)—I respectfully dissent.

I. In Division I of the majority opinion it is held the trial court was right in submitting larceny from the person as an in-

cluded offense. Since the defendant was charged with, and the court submitted, robbery with aggravation, I feel the trial court would be right in submitting larceny from the person as an included offense were it not for what I will later discuss. But in this connection I wish to state that I do not subscribe to a rule that it would not be error under a robbery indictment to submit larceny from the person if the charge or proof was merely robbery without aggravation. To so hold would mean the included offense, larceny from the person, carrying a fifteen-year penitentiary sentence, would be greater than robbery without aggravation, carrying a ten-year penitentiary sentence. I merely mention this for there are expressions in our past opinions which might lead one to believe larceny from the person is *always* an included offense and should be submitted in *all* trials for robbery. See State v. Graff, 66 Iowa 482, 24 N.W. 6; State v. Mikesell, 70 Iowa 176, 30 N.W. 474; State v. Reasby, 100 Iowa 231, 69 N.W. 451; State v. Wasson, 126 Iowa 320, 101 N.W. 1125; State v. Taylor, 140 Iowa 470, 118 N.W. 747; State v. Schell, 172 Iowa 127, 153 N.W. 62; State v. Warneke, 219 Iowa 1239, 260 N.W. 667. Then too in this case, in submitting the included offenses, the trial court's order of submission by numbered special verdict forms was: (1) robbery with aggravation (2) robbery without aggravation (3) larceny from the person, and so on. I feel the trial court should have submitted larceny from the person second and ahead of robbery without aggravation for under the statutes it is a higher offense. I feel certain the order of submission gave the jury the impression that larceny from the person was a lesser offense than robbery without aggravation. While I feel larceny from the person can be submitted in a proper case of robbery with aggravation, I would like to see our opinion in this case state, even by way of dictum, that it cannot be submitted in a case of robbery without aggravation. I do not think on a proper analysis of our former opinions it will be found we have ever held this, though some of the statements in the opinions would seem to indicate such a conclusion. Such a statement in our opinion in this case might forestall error in future cases.

The statements in State v. Taylor, 140 Iowa 470, 118 N.W. 747, and State v. Schell, 172 Iowa 127, 153 N.W. 62, cited in this division of the majority opinion, to the effect that larceny from a

person is an included offense in a robbery trial are based on the holding in State v. Graff, 66 Iowa 482, 24 N.W. 6, where defendant was indicted for and convicted of larceny from the person. My point is that even though every robbery involves a larceny from the person, still the statutory penalty for larceny from the person (fifteen years) forbids its inclusion in a robbery without aggravation (ten years) case. An included offense must be a lesser offense than the one charged in the indictment.

II. In Division III of the majority opinion it is held larceny from the person can be larceny of property "in the possession and immediate presence—in the immediate charge and custody—of the prosecutrix." The general rule is that larceny from the person contemplates larceny of property actually upon or attached to the person.

In People v. DeVaughn, 63 Cal. App. 513, 515, 218 P. 1020, 1021, it is held: "In order that grand larceny may be committed in the taking of property from the person of another, there must be evidence to support the conclusion that at the time the property was taken it was actually upon or attached to the person, by his clothing or otherwise, or that it was in some manner in his actual physical possession."

The case is much like Wilder v. State, 30 Ala. App. 107, 108, 1 So.2d 317, where defendant was convicted of larceny from the person and the facts were that a theater patron "grabbed" a lady's purse from the adjoining empty seat where she had placed it, and hurried out of the building. In holding that under this evidence the defendant could not "as a matter of law" be guilty of larceny from the person the court states its conclusion—that the taking must be from actual physical possession to support conviction—is "supported by the overwhelming weight of authority." The opinion quotes with approval the rule of an early California case (People v. McElroy, 116 Cal. 583, 586, 48 P. 718, 719): " 'that it [larceny from the person] was not intended to include property removed from the person and laid aside, however immediately it may be retained in the presence or constructive control or possession of the owner while so laid away from his person and out of his hands.' "

See also People v. Crenshaw, 63 Cal. App. 2d 395, 146 P.2d 690.

In Harris and Wilshere's Criminal Law, Seventeenth Ed. (1943) page 320, it is stated that in "Larceny from the person * * * (b) the goods must actually be taken from the person, not, e.g., from clothes which the prosecutor has taken off * * * the goods must be actually severed from the person * * *."

In Rapalje's Larceny and Kindred Offenses, section 16, it is stated: "To constitute this offense (larceny from the person) the theft must be from the person, and not merely in the presence of the dispossessed party."

The majority opinion, like the opinion in Banks v. State, 74 Ga. App. 449, 40 S.E.2d 103 (cited in the majority opinion), rests the conclusion on the authority of the robbery cases. It is true the phrase is about the same in both statutes.

In section 711.1, Code, 1950, robbery is defined: "If any person, with force or violence, or by putting in fear, steal and take from the person of another * * *."

In section 709.6, the provision is that if a person "commit the crime of larceny * * * by stealing from the person of another, he shall be imprisoned in the penitentiary" for fifteen years.

But there is this difference in the two statutes: Section 711.1 is a statute of definition and section 709.6 is a statute of classification. The latter only increases the punishment for the thief when his larceny is "from the person." The words "from the person" used in defining robbery had, at common law, the meaning of a taking from personal presence by violence or putting in fear. It will be presumed the legislature in defining robbery intended the same inclusions that the phrase "from the person" carried at common law.

In O'Donnell v. People, 224 Ill. 218, 226, 79 N.E. 639, 642, 8 Ann. Cas. 123, it is stated:

"It is a familiar rule of construction that, when a statute uses words which have a definite and well-known meaning at common law it will be presumed that the terms are used in the sense in which they were understood at common law, and will be so construed unless it clearly appears that it was not so intended. 2 Sutherland on Stat. Const., sec. 398; Kirchoff v. Union Mutual Life Ins. Co., 128 Ill. 199, 20 N.E. 808; Meadowcroft v. Winnebago County, 181 Ill. 504, 54 N.E. 949. It will never be presumed

that the legislature intended to make an innovation upon the common law further than the necessity of the case required, and the best rule of construction is to construe a statute as close to the reason of the common law as may be consistent with the terms employed. The words 'from the person of another,' found in our statutory definition of robbery, must be held to have been used in the same sense and with the same meaning that these terms had acquired at common law at the time the statute was enacted, and the offense of robbery, under our statute, may be committed by violence or putting in fear, and feloniously taking money or other thing of value from the person or in the presence and under the immediate control and possession of the person assaulted. There is nothing in our statute that shows that the term 'from the person' was used in the restricted and popular sense contended for by plaintiff in error."

But the same cannot be said of larceny from the person. While robbery is an offense against the person, larceny is an offense against possession. 52 C. J. S., Larceny, section 1. The legislature first provides for punishment for larceny, based on the value of the property stolen, and then classifies some larcenies for increased punishment. Thus larcenies in the daytime and larcenies in the nighttime and larcenies in dwelling houses, stores, buildings, boats, motor vehicles, etc. receive different *increased* penalties. And larceny from a building on fire or "from the person of another" receives the highest *increased* penalty of all— fifteen years in the penitentiary without regard to the value of the property stolen. Surely the word "from" has the same meaning in the two phrases in section 709.6: "from any building on fire * * * or * * * from the person of another." It means the property must be in the building or on the person. This section, like all criminal statutes that enhance the punishment, must be strictly construed. It can increase the penalty for a thief who steals property of trivial value from a hundred-dollar fine to fifteen years in the penitentiary.

I do not feel the robbery cases support the conclusion that a larceny-from-the-person classification is established by proof. which shows the property was not on the person of another. That is the basis on which the conclusion of the majority rests. The

Georgia case, Banks v. State, supra, stands alone and upon the same reasoning: the robbery cases.

Here the jury convicted the defendant of larceny, admittedly of $27 and the evidence sustains such conviction. But I do not feel the evidence sustains the conviction of larceny from the person. Only part of the verdict is not sustained by the evidence and that part only goes to the sentence or punishment.

In the recent case of State v. Barlow, 242 Iowa 714, 46 N.W. 2d 725, where that part of a verdict finding defendant had twice before been convicted of driving while intoxicated was not sustained by the evidence—as to one prior conviction—we held that the error did not demand a reversal and the cause could be remanded for the appropriate sentence upon the verdict of guilty of the principal crime and one prior conviction.

In 24 C. J. S., Criminal Law, section 1579b, it is stated:

"Where the court is of the opinion that the evidence does not warrant the verdict of guilty of the offense charged in the indictment, but that it is sufficient to support a conviction for a lesser offense necessarily included in the indictment and verdict, it has power to impose sentence for the lesser offense; and under an indictment including a lesser in the greater offense charged, a verdict of guilty includes the lesser offense so that a sentence appropriate to the lesser offense is not repugnant to the charge or to the verdict."

In State v. Fields, 70 Iowa 196, 198, 30 N.W. 480, 481, where the defendant was convicted of murder in the first degree and on appeal we felt the evidence was insufficient to establish a deliberate murder, we, "at the suggestion of defendant's counsel, and with the consent of the attorney general * * * concluded to reduce the sentence to the maximum punishment authorized for the crime of manslaughter."

Defendant argues "that the crime committed under the uncontradicted testimony in this case could have been no greater than the crime of grand larceny unless the jury had believed some force or violence was used in abstracting the property." The jury by its rejection of the robbery verdicts evidently did not believe

force or violence was used. I would remand the case with directions to reduce the sentence to the maximum punishment for grand larceny.

I am authorized to state that OLIVER and HAYS, JJ., join in this dissent.